STATE OF INDIANA    FILED IN CLERK'S OFFICE COUNTY SUPERIOR/CIRCUIT COURT

) SS:

COUNTY OF LAKE    2017 SEP 29    CAUSE NO. _____ 45D04 1 7 1 0 -CT- 0 0 2 0 2

**Jury Demanded**    MICHAEL A. BROWN
CLERK LAKE SUPERIOR COURT

---

SHERRIE BAKER, LUTRICIA CLAY, M.C. by next friend Lutricia Clay,
C.C. by next friend Lutricia Clay, KAMIA EDWARDS, B.E. by next
friend Kamia Edwards, J.J. by next friend Kamia Edwards, KEMIQUA
FUNCHES, MARCELL WASHINGTON, Sr., K.F. by next friend
Kemiqua Funches, M.W. by next friend Kemiqua Funches, NICOLE
HALL, KEISHA HILL, A.H. by next friend Keisha Hill, D.M. by next
friend Keisha Hill, SHERRY JACKSON, J.H. by next friend Sherry
Jackson, A.J. by next friend Sherry Jackson, CATHERINE JOHNSON,
MARTRICE JOHNSON, WILLIE MAE MOORE, TAMMIE MOORE,
J.J. by next friend Tammie Moore, RANA PERSON, D.D. by next friend
Rana Person, M.B. by next friend Rana Person, T.B. by next friend Rana
Person, D.B. by next friend Rana person, KEVIN POWELL, DUANE
SNELLING Sr., OPHELIA WALKER, SHANNON WILLIAMS, S.W.1
by next friend Shannon Williams, S.W.2 by next friend Shannon Williams,
S.W.3 by next friend Shannon Williams, and LLOYD WILLIAMS,

    Plaintiffs,

v.

ATLANTIC RICHFIELD COMPANY; TESORO REFINING AND
MARKETING COMPANY; BP WEST COAST PRODUCTS, LLC; E. I.
DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS
COMPANY; HAMMOND GROUP, INC.; HAMMOND LEAD
PRODUCTS, LLC; HALSTAB, LLC; and HALOX, LLC,

    Defendants.

---

## COMPLAINT

    Sherrie Baker, Lutricia Clay, M.C. by next friend Lutricia Clay, C.C. by next friend

Lutricia Clay, Kamia Edwards, B.E. by next friend Kamia Edwards, J.J. by next friend Kamia

Edwards, Kemiqua Funches, Marcell Washington, Sr., K.F. by next friend Kemiqua Funches,

M.W. by next friend Kemiqua Funches, Nicole Hall, Keisha Hill, A.H. by next friend Keisha

1

Hill, D.M. by next friend Keisha Hill, Sherry Jackson, J.H. by next friend Sherry Jackson, A.J. by next friend Sherry Jackson, Catherine Johnson, Martrice Johnson, Willie Mae Moore, Tammie Moore, J.J. by next friend Tammie Moore, Rana Person, D.D. by next friend Rana Person, M.B. by next friend Rana Person, T.B. by next friend Rana Person, D.B. by next friend Rana person, Kevin Powell, Duane Snelling Sr., Ophelia Walker, Shannon Williams, S.W.1 by next friend Shannon Williams, S.W.2 by next friend Shannon Williams, S.W.3 by next friend Shannon Williams, and Lloyd Williams (collectively "Plaintiffs"), by counsel, allege as follows:

1.      The Plaintiffs named herein are victims of the corporate Defendants' decades of rampant pollution of the land upon which the Plaintiffs live. They bring this case for the profound and tragic physical and economic injuries caused by the Defendants' decades of negligent, recklessness, and intentional release of dangerously large amounts of toxins into the environment that have contaminated property located in Lake County, Indiana, where the Plaintiffs live. After a century of abuse, this contamination of lead, arsenic, and likely other substances has reached a point where it has not only wreaked havoc on the property in the region, but has caused serious, life-altering injuries to the people.

2.      This action is brought in accordance with the dictates set forth by the Indiana Supreme Court, which has recognized:

> A business should bear its own costs, burdens, and expenses of operation, and these should be distributed by means of the price of the resulting product and not shifted, particularly, to small neighboring property owners for them to bear alone. We can understand no sensible or reasonable principle of law for shifting such expense or loss to persons who are not involved in such business ventures for profit. Industrial development is to be encouraged, not at the expense of private individuals without their consent, but by the price of the resulting product in the industry itself.

*Enos Coal Mining Co. v. Schuchart*, 243 Ind. 692, 697, 188 N.E.2d 406, 408 (1962); *see also*

*Shell Oil Co. v. Meyer*, 684 N.E.2d 504, 517 (Ind. Ct. App. 1997); *Mowrer v. Ashland Oil & Refining Co.*, 518 F.2d 659, 662 (7th Cir. 1975) (applying Indiana law).

3.      Dating back to 1906, industrial uses of land in the City of East Chicago have resulted in an untold impact upon the environment. At issue here is a piece of land designated by the U.S. Environmental Protection Agency ("EPA") as the U.S. Smelter and Lead Refinery, Inc. Superfund Site (the "Site").

4.      The Site and the area surrounding it were operated by numerous corporate entities, including U.S. Smelter and Lead Refinery, Inc., Anaconda Lead Products, E. I. Du Pont de Nemours and Company, and Hammond Lead Products, Inc.

5.      Through the operation of their manufacturing facilities, these various corporate entities and others have negligently and wantonly exposed the Site and the people living and working in the area to hazardous byproducts and waste.

6.      Despite their knowledge of the dangers to health and wellbeing posed by their environmental contamination, the polluting companies failed to warn area residents, including without limitation the Plaintiffs, of these extreme dangers. These companies actively concealed from Plaintiffs the fact and extent of their pollution and the dangers it posed. As a result, the Plaintiffs – a vast majority of whom are children – lived and played on what is essentially a toxic waste dump with no knowledge of the dangers to which they were being continually exposed.

7.      As a direct result of the Defendants' failures to warn and active concealment of these dangers, the residents of the Site have only recently discovered that they have been exposed to hazardous materials including without limitation lead and arsenic and that the soil on the Site is heavily contaminated.

8.      This action is brought against the entities who have either been the direct cause of

the contamination or have stepped into the shoes of those who did.

9.      This action is also brought against those entities who knew of the danger and stood silent, at times even drawing a direct benefit from that silence, while Plaintiffs and others were left unknowingly subjected to toxic substances that have caused permanent physical, emotional and mental injuries, as well as direct economic damages.

10.     Plaintiffs bring claims against Defendants Atlantic Richfield Company, Tesoro Refining and Marketing Company; BP West Coast Products, LLC; E. I Du Pont de Nemours and Company; The Chemours Company; Hammond Group, Inc.; Hammond Lead Products, LLC; Halstab, LLC; and Halox, LLC for strict liability, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and punitive damages.

## PARTIES

11.     Plaintiff Sherrie Baker was a resident of Lake County, Indiana, who occupied a residence on the Site. She resided at the West Calumet Housing Complex.

12.     Plaintiff Lutricia Clay was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Lutricia Clay as Plaintiffs are minors M.C. and C.C. who have resided with her at the West Calumet Housing Complex.

13.     Plaintiff Kamia Edwards was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Kamia Edwards as Plaintiffs are minors B.E. and J.J. who have resided with her at the West Calumet Housing Complex.

14.     Plaintiff Kemiqua Funches was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Kemiqua Funches as Plaintiffs are Marcell Washington, Sr. and minors K.F. and M.W. who have resided with her at the West Calumet Housing Complex.

15.     Plaintiff Nicole Hall was a resident of Lake County, Indiana, who occupied a

residence on the Site. Nicole Hall resided at the West Calumet Housing Complex.

16.    Plaintiff Keisha Hill was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Sherry Jackson as Plaintiffs are minors A.H. and D.M. who have resided with her at the West Calumet Housing Complex.

17.    Plaintiff Sherry Jackson was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Sherry Jackson as Plaintiffs are minors J.H. and A.J., who have resided with her at the West Calumet Housing Complex.

18.    Plaintiff Catherine Johnson was a resident of Lake County, Indiana, who occupied a residence on the Site. Catherine Johnson resided at the West Calumet Housing Complex.

19.    Plaintiff Martrice Johnson was a resident of Lake County, Indiana, who occupied a residence on the Site. Martrice Johnson resided at the West Calumet Housing Complex.

20.    Plaintiff Willie Mae Moore and was a resident of Lake County, Indiana, who occupied a residence on the Site. Each resided at the West Calumet Housing Complex.

21.    Plaintiff Tammie Moore was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Tammie Moore as Plaintiff is minor J.J. who resided with her at the West Calumet Housing Complex.

22.    Plaintiff Rana Person was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Tammie Moore as Plaintiff are minors D.D., M.B., T.B., and D.B. who resided with her at the West Calumet Housing Complex.

23.    Plaintiff Kevin Powell was a resident of Lake County, Indiana, who occupied a residence on the Site. He resided at the West Calumet Housing Complex.

24.    Plaintiff Duane Snelling Sr. was a resident of Lake County, Indiana, who occupied a residence on the Site. He resided at the West Calumet Housing Complex.

25.     Plaintiff Ophelia Walker was a resident of Lake County, Indiana, who occupied a residence on the Site. She resided at the West Calumet Housing Complex.

26.     Plaintiff Shannon Williams was a resident of Lake County, Indiana, who occupied a residence on the Site. Joining Shannon Williams as Plaintiffs are minors S.W.1, S.W.2, and S.W.3 who have resided with her at the West Calumet Housing Complex.

27.     Plaintiff Lloyd Williams was a resident of Lake County, Indiana, who occupied a residence on the Site. He resided at the West Calumet Housing Complex.

28.     International Lead Refining Company, International Smelting Company, International Smelting & Refining Company, Anaconda Lead Products Company, Anaconda Copper Mining Company, and The Anaconda Company.  (collectively "Anaconda").

29.     Defendant Atlantic Richfield Company is a Delaware for-profit corporation authorized to do business in the State of Indiana. Its Registered Agent is CT Corporation System, 150 West Market Street, Indianapolis, Indiana 46204. Atlantic Richfield Company is a successor to the liability of Anaconda.

30.     Defendant BP West Coast Products, LLC is a Delaware limited liability company with its headquarters in Los Angeles, California and an indirect, wholly owned subsidiary of BP PLC. In April 2000, Atlantic Richfield Company was acquired by BP Amoco, with Atlantic Richfield Company transferring substantially all of its retail and refining assets to BP West Coast Products, LLC.

31.     Defendant Tesoro Refining and Marketing Company ("Tesoro") is a Delaware limited liability company. Its Registered Agent is Corporation Service Company, 2711 Centerville Rd., Suite 400, Wilmington, DE 19808. Atlantic Richfield Company and substantially all of its assets were acquired from BP West Coast Products, LLC by Tesoro in

2013. Pursuant to the Purchase and Sale Agreement, Tesoro assumed the environmental liabilities of the assets it acquired, including Atlantic Richfield Company and became a successor in interest to Anaconda, Atlantic Richfield Company, and BP West Coast Products, LLC.

32.     Atlantic Richfield Company and substantially all of its assets were acquired from BP West Coast Products, LLC by Tesoro in 2013. Pursuant to the Purchase and Sale Agreement, Tesoro assumed the environmental liabilities of the assets it acquired, including Atlantic Richfield Company and became a successor in interest to Anaconda, Atlantic Richfield Company, and BP West Coast Products, LLC.

33.     Anaconda, Atlantic Richfield Company, BP West Coast Products, LLC, and Tesoro are collectively referred to throughout this Complaint as "ARCO."

34.     Defendant E. I. Du Pont de Nemours and Company is a Delaware for-profit corporation authorized to do business in the State of Indiana. Its Registered Agent is CT Corporation System, 150 West Market Street, Indianapolis, Indiana 46204.

35.     Defendant The Chemours Company is a Delaware for-profit corporation authorized to do business in the State of Indiana. Chemours is a subsidiary of Its Registered Agent is CT Corporation System, 150 West Market Street, Indianapolis, Indiana 46204. Chemours is a subsidiary of DuPont, which has assumed DuPont's responsibilities under the Consent Decree.

36.     Recently, E. I Du Pont de Nemours and Company restructured itself and created The Chemours Company as a separate company.

37.     The Chemours Company has assumed at least some portion of E. I. Du Pont de Nemours and Company's liability.

38.     E. I Du Pont de Nemours and Company and The Chemours Company are

7

collectively referred to throughout this Complaint as "DuPont."

39.     Defendant Hammond Group, Inc. is an Indiana for-profit corporation formerly named Hammond Lead Products Inc. Its Registered Agent is Stephen A. Bolanowski Jr., 1414 Field Street, Building B, Hammond, Indiana 46320.

40.     Defendant Hammond Lead Products, LLC is an Indiana limited liability company and is a subsidiary of Hammond Group, Inc. Its Registered Agent is Stephen A. Bolanowski Jr., 1414 Field Street, Building B, Hammond, Indiana 46320.

41.     Defendant Halstab, LLC is an Indiana limited liability company and is a subsidiary of Hammond Group, Inc. Its Registered Agent is Hammond Group, Inc. c/o Stephen A. Bolanowski Jr., 1414 Field Street, Building B, Hammond, Indiana 46320.

42.     Defendant Halox, LLC is an Indiana limited liability company and is a subsidiary of Hammond Group, Inc. Its Registered Agent is Stephen A. Bolanowski, 1414 Field Street, Building B, Hammond, Indiana 46320.

43.     Hammond Group, Inc., Hammond Lead Products, LLC, Halstab, LLC, and Halox LLC are collectively referred to throughout this Complaint as "Hammond Lead."

## FACTS

### Pollution of the Site by USS Lead

44.     In or about 1906, construction of industrial buildings began on and around the Site.

45.     From 1906 to 1920, much of the land on and around the Site was primarily owned and operated by the Delmar Copper Refinery Company to produce and smelt copper.

46.     In 1920, a portion of the land on and around the Site previously owned by the Delmar Copper Refinery Company was acquired by U.S. Smelting, Refining, and Mining, and later transferred to U.S. Smelter and Lead Refinery. Inc. ("USS Lead").

47. Among other activities, USS Lead operated a primary lead smelter on 25 acres of its property.

48. In 1973, USS Lead converted to secondary smelting, recovering lead from scrap metal and old automobile batteries.

49. USS Lead continued in this capacity until ceasing operations on the USS Lead Superfund Site in or about December 1985.

50. USS Lead's smelting operations produced waste materials such as blast furnace slag and lead-containing dust emitted by the blast furnace stack and rooftop vents.

51. USS Lead piled and spread the blast furnace slag, which contained lead and other hazardous substances, on its property adjacent to the Site.

52. The lead-containing dust from the blast furnace stack was stockpiled on USS Lead's property adjacent to the Site, covering as much as five (5) acres of the property.

53. In 1975, USS Lead obtained a permit permitting limited discharge of furnace cooling water and storm water run-off into the Grand Calumet River.

54. USS Lead received a second permit in 1985. Throughout the years that USS Lead possessed permits, USS Lead frequently and routinely exceeded the permitted discharge amounts.

55. USS Lead filed for bankruptcy in 1987.

### Pollution of the Site by DuPont

56. DuPont's manufacturing of lead arsenate insecticide at its East Chicago facility also contributed to pollution of the Site.

57. DuPont owns property abutting the Site and the property owned by USS Lead.

58. From 1910 to 1949, DuPont operated a facility adjacent to USS Lead, which

9

manufactured lead arsenate insecticide.

59.    Historically, DuPont's facility on and around the Site was used to manufacture the pesticide lead arsenate.

60.    Through operation of its facility and use of its property, DuPont has caused hazardous substances such as lead and arsenic to contaminate the Site.

61.    This action does not pertain to DuPont's manufacture and production of Freon-12 and the byproduct of hydrochloric acid.

### Pollution of the Site by Anaconda (ARCO)

62.    In addition to USS Lead and DuPont, Anaconda operated on and around the Site from at least 1938 to 1965.

63.    Anaconda operated on land just to the north of USS Lead's facility and northwest of DuPont's facility.

64.    Anaconda's facility on and around the Site manufactured white lead and zinc oxide.

65.    Through operation of its facility and use of its property, Anaconda has caused hazardous substances such as lead and arsenic to contaminate the Site.

66.    In 1976, ARCO merged with Anaconda, assuming Anaconda's liabilities.

### Pollution of the Site by Hammond Lead

67.    Hammond Lead's manufacturing operations at two locations to the south of the Site have also contributed to its contamination with hazardous substances.

68.    The two Hammond Lead properties are known as the Halstab Division and as the Halox Division.

69.    Hammond Lead has used the two properties to produce lead substances since

10

1930.

70.     Hammond Lead's manufacturing processes result in lead particles and substances contamination due to transport of the hazardous substances through air emissions.

71.     Through operation of its facility and use of its property, Hammond Lead has caused hazardous substances such as lead and arsenic to contaminate the Site.

72.     This contamination is evidence by an environmental assessment commissioned by USS Lead in the year 2000.

73.     The assessment summarized its findings and conclusions in a document titled "Independent Assessment of the Impacts of Historical Lead Air Emissions in East Chicago, Indiana" (the "Independent Assessment").

74.     A copy of the Independent Assessment was furnished to the EPA.

75.     The Independent Assessment concluded that Hammond Lead's manufacturing operations were a substantial contributor to the lead contamination of the Site.

### West Calumet Housing Complex

76.     In the early 1970s, the East Chicago Housing Authority constructed low-income residential units on the Site (the "West Calumet Housing Complex").

77.     The West Calumet Housing Complex is comprised of three-story apartment buildings and brick duplexes with large lawns on the old Anaconda plant site to provide housing for low-income residents.

78.     As associated reporters Sara Burnett and Jason Keyser aptly stated in a September article: "Modern-day sensibilities would reject such an idea, but when the East Chicago Housing Authority was searching for sites, Executive Director Benjamin Lesniak said there was little available land except 'in vacant areas which are surrounded by industries and undesirable

11

residential areas,' according to a 1966 Chicago Tribune article."

79.    For decades, residents of the West Calumet Housing Complex and other residents on and around the Site were exposed to hazardous levels of lead, arsenic, and other contamination as a direct result of emissions and discharges by each Defendant from its facility nearby.

### EPA Investigations

80.    The EPA proposed USS Lead to the National Priorities List ("NPL") on February 7, 1992.

81.    After the 1992 proposal to the NPL, the EPA determined that the USS Lead facility would be best addressed by the Resource Conservation and Recovery Act (RCRA) program.

82.    On November 18, 1993, the EPA issued an Administrative Order on Consent to USS Lead under RCRA 3008(h) authority.

83.    The Administrative Order of Consent was the beginning of more than two decades of EPA involvement at the Site.

84.    Under the Hazard Ranking System, the Site was evaluated in September 2008; this evaluation determined that there was an observed release of lead in the air-migration pathway as well as in the surface-water migration pathway. The Site was listed as a Superfund site on the National Priorities List on April 8, 2009.

85.    The EPA continued to investigate potential sources of contamination at the Site.

86.    In August 2005, the EPA sent letters seeking information from parties potentially responsible for the contamination at the Site.

87.    Letters were sent to ARCO, DuPont, and Hammond Lead, as well as others.

88.    On the basis of its preliminary investigations, the EPA sent General Notice of Liability letters to USS Lead, ARCO, DuPont, and possibly other entities.

89.    On September 3, 2014, the United States, acting on request of the EPA and the state of Indiana, filed a complaint against ARCO and DuPont.

90.    On October 28, 2014, ARCO and DuPont entered into a consent decree with the United States agreeing to pay roughly $26 million toward the cleanup of the Site.

### Plaintiffs' Discovery of the Contamination

91.    After decades of silence, on July 25, 2016, East Chicago Mayor Anthony Copeland sent letters to residents of the West Calumet Housing Complex, including the Plaintiffs, stating:

> Dear Resident:
>
> Your health and safety are always my first priority.
>
> When the City and the East Chicago Housing Authority (`ECHA_) recently were informed by the EPA that the ground within the West Calumet Housing Complex was highly contaminated with lead and arsenic, we moved immediately to protect your safety, health, and welfare.
>
> The identification of lead and arsenic poses potential dangers, and that is why I ordered the East Chicago Health Department to offer lead testing to you and your children. Now that we know the levels of lead in the ground in West Calumet Housing Complex, we feel it is in your best interest to temporarily relocate your household to safer conditions. ECHA is asking HUD to provide vouchers for safe, sanitary housing as soon as possible. Even though this may be a great inconvenience to you, it´s necessary to protect you and your children from possible harm.
>
> The staff of ECHA, including the Section 8 staff will be assisting you in the coming days, and we will continue to provide you with information as soon as it becomes available.
>
> We ask for your patience and cooperation in this process.

92.    Prior to the letter, each Plaintiff did not know that he or she had been exposed to hazardous levels of lead or other toxins.

93.    Prior to the letter, each Plaintiff did not know that he or she had been injured by

his or her exposure to hazardous levels of lead or other toxins.

94.    Although the EPA collected samples from the Site and its residences for more than two decades prior, the EPA did not inform Plaintiffs or other residents that they had been exposed to dangerous levels of lead or other toxins.

95.    It was not until early 2016 that the EPA finally delivered the results of its testing to the City of East Chicago.

96.    Prior to Plaintiffs' ultimate discovery of their exposure to hazardous levels of lead or other toxins, each Defendant acted intentionally to conceal from Plaintiffs that each Defendant had discharged, released, and/or caused to be released hazardous substances such as lead arsenic, and other toxins.

### Plaintiffs' Injuries

97.    Each Plaintiff was exposed to hazardous levels of lead or other toxins while a resident of the Site.

98.    Each Plaintiff has suffered physical, mental, and emotional harm as a direct and proximate result of his or her exposure to the lead or other chemical contamination at the Site.

### COUNT I
### STRICT LIABILITY

99.    Plaintiffs incorporate the allegations set forth above as though set forth fully here unless directly contradicted by the allegations in this Count.

100.    Each Defendant manufactured, processed, stored, and/or used materials on its property that could and did result in the release of lead and other hazardous particles impacting persons and property on and around the Site, including each Plaintiff.

101.    The manufacture, processing, storage, and use of materials resulting in the release of lead and other hazardous particles by each Defendant on and around the Site constitute

abnormally dangerous and ultrahazardous activities.

102.    Each Defendant's manufacture, processing, storage, and use of materials resulting in the release of lead particles involves a high degree of risk to persons and property, which cannot be totally eliminated by reasonable care, constitutes an activity not regularly practiced by members of the community, and is an activity located in and around residential areas.

103.    Each Defendant knowingly, recklessly, and/or intentionally discharged, released, and/or caused to be released hazardous substances such as lead, arsenic, and other substances.

104.    Each Plaintiff was a resident nearby each Defendant's source of operations.

105.    The conduct of each Defendant in its operations resulting in the release of lead and other hazardous particles created a risk of injury and/or damage to others, specifically the Plaintiffs.

106.    Each Defendant had, and has, a duty of care to take reasonable measures to prevent the injury and/or damage to others resulting from its operations on and around the Site.

107.    Each Defendant had, and has, a duty to prevent the release of hazardous substances such as lead and other hazardous particles from escaping its property and control.

108.    Each Defendant is strictly liable to each Plaintiff based upon the injuries suffered by each Plaintiff as a direct result of each Defendant engaging in abnormally dangerous and ultrahazardous activities.

109.    Each Defendant actually knew or should have known that lead and other hazardous particles have the potential to cause serious harm to the Plaintiffs.

110.    As a direct and proximate result of each Defendant's breach of its duties, Plaintiffs have suffered and continue to suffer financial, physical, mental, and emotional damages.

111.    Plaintiffs were each foreseeable persons to suffer the exact type of injuries that each has suffered as a result of each Defendant's release of hazardous substances.

112.    Each Plaintiff has suffered financial, physical, mental, and emotional damages stemming directly from their exposure to lead particles, discharged by each Defendant.

## COUNT II
## NEGLIGENCE

113.    Plaintiffs incorporate the allegations set forth above as though set forth fully here unless directly contradicted by the allegations in this Count.

114.    The conduct of each Defendant in its operations resulting in the release of lead and other hazardous particles created a risk of injury and/or damage to others, specifically the Plaintiffs.

115.    Each Defendant had, and has, a duty of care to take reasonable measures to prevent the injury and/or damage to others resulting from its operations on and around the Site.

116.    Each Defendant had, and has, a duty to prevent the release of hazardous substances such as lead and other hazardous particles from escaping its property and control.

117.    Each Defendant had, and has, a duty to monitor its operations to ensure that the operations were not resulting in the accumulation of hazardous substances such as lead and other hazardous substances.

118.    Each Defendant had, and has, a duty to control and maintain their operations on and around the Site in a non-polluting manner.

119.    Each Defendant had, and has, a duty not to permit or allow hazardous substances to invade properties of others.

120.    Each Defendant had, and has, a duty to respond promptly to any release of contaminants in a manner that would prevent or mitigate further migration of contaminants.

16

121.    Each Defendant had, and has, a duty under the statutes and regulations promulgated by the State of Indiana and its agencies to prevent, contain, and remediate the discharge and/or release of hazardous substances such as lead and other hazardous substances.

122.    Each Defendant had, and has, a duty to warn foreseeable persons who would be expected to be harmed by the discharge and/or release of hazardous substances such as lead and other hazardous substances.

123.    Plaintiffs were foreseeable persons to each Defendant who would be expected to be harmed by the discharge and/or release of hazardous substances such as lead and other hazardous substances.

124.    Contaminants of the type discovered in soil in and around the Site do not naturally accumulate in the amounts discovered in the absence of negligent conduct.

125.    The unnatural concentrations of lead and other hazardous substances in the soil in and around the Site can only be the result of human intervention through industrial processes.

126.    Each Defendant exercised exclusive management and control over the lead and other hazardous particles prior to their release and subsequent contamination on and around the Site.

127.    The danger posed by release of hazardous substances such as lead and other hazardous substances is extremely high, necessitating an elevated, proportional degree of care.

128.    Upon learning of the migration of the contaminants, each Defendant had, and has, a duty to take action to stop migration and remediate the contamination.

129.    Each Defendant has breached its duties by its negligent acts and omissions in operating and maintaining its operations on and around the Site, by failing to implement safeguards to assure against the release of hazardous substances such as lead and other hazardous

17

substances, failing to promptly and effectively address the release of hazardous substances such as lead and other hazardous substances, and by failing to prevent migration of contaminants such as lead and other hazardous substances.

130.    Each Defendant actually knew or should have known that lead and other hazardous particles have the potential to cause serious harm to the Plaintiffs.

131.    As a direct and proximate result of each Defendant's breach of its duties, Plaintiffs have suffered and continue to suffer financial, physical, mental, and emotional damages.

132.    Plaintiffs were each foreseeable persons to suffer the exact type of injuries that each has suffered as a result of each Defendant's release of hazardous substances.

133.    Each Plaintiff has suffered financial, physical, mental, and emotional damages stemming directly from their exposure to lead particles, discharged by each Defendant.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

134.    Plaintiffs incorporate the allegations set forth above as though set forth fully here unless directly contradicted by the allegations in this Count.

135.    The conduct of defendants described above is extreme and outrageous.

136.    Defendants acted with reckless disregard toward the health, safety, and wellbeing of Plaintiffs and others.

137.    The actions of defendants described above were both the cause in fact and proximate cause of emotional distress to each Plaintiff.

138.    Each Plaintiff suffered severe emotional distress as a result of Defendants'' actions including emotional distress owing to each Plaintiff's own exposure to hazardous substances and the emotional distress caused by the knowledge and witnessing of the harm

18

forced upon other members of each Plaintiff's household and family.

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

139.    Plaintiffs incorporate the allegations set forth above as though set forth fully here unless directly contradicted by the allegations in this Count.

140.    Each Plaintiff was exposed to a disease-causing agent or substance, including hazardous levels of lead.

141.    Each Defendant is responsible for exposing each Plaintiff to the disease-causing agent or substance.

142.    Each Plaintiff is currently suffering, or has suffered, from emotional distress associated with the fear of contracting a future disease or illness.

143.    Each Plaintiff is currently suffering, or has suffered, from emotional distress associated with the fear of a family member or other closely related person contracting a future disease or illness as the result of the exposure to disease-causing agents or substances due to the actions of each Defendant.

144.    The Plaintiffs who are guardians and/or parents of other Plaintiffs have suffered the anguish and distress of witnessing injury and infliction of exposure to hazardous substances upon the children in their care.

145.    Each Plaintiff has been directly impacted by disease-causing agents or substances as a direct result of Defendants' actions.

146.    The emotional distress suffered by each Plaintiff was proximately caused by exposure to the disease-causing agent or substance.

147.    Each Plaintiff's fear of contracting a disease or of a loved one contracting a disease as a result of exposure to disease-causing agents is reasonable.

148.    Each Plaintiff has seen an increase in risk of disease as a result of his or her exposure to the disease causing agent or substance.

## COUNT V
## PUNITIVE DAMAGES

149.    Plaintiffs incorporate the allegations set forth above as though set forth fully here unless directly contradicted by the allegations in this Count.

150.    The Defendants' actions described above were committed with knowledge or reckless disregard for their consequences and the safety and well being of the Plaintiffs, who were the reasonably foreseeable victims of this conduct.

151.    In committing these acts, the Defendants acted with malice, fraud, gross negligence, or oppressiveness which was not the result of mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

152.    The Plaintiffs were all harmed as a direct and proximate result of these acts by the Defendants.

153.    A judgment of punitive damages in the amount of One Hundred Million Dollars ($100,000,000.00) is appropriate in this matter to punish Defendants for their acts and omissions and deter Defendants and others from like conduct in the future.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court enter judgment against the Defendants and in favor of the Plaintiffs in amounts that will fairly compensate them for those losses, harms, injuries, and damages they have and will sustain as a result of Defendants' wrongdoing and for all other just and proper relief.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand trial by jury.

Respectfully submitted,

**WALTER J. ALVAREZ, P.C.**

_____
Walter J. Alvarez
Brock Alvarado
Steven J. Alvarez
1524 West 96th Ave.
Crown Point, Indiana 46307
(219) 662-6400
(219) 6626410 *fax*
***Attorneys for Plaintiffs***

**PAVLACK LAW, LLC**

_____
Eric S. Pavlack
Colin E. Flora
255 N. Alabama St., Ste. 301
Indianapolis, IN 46204
(317) 251-1100
(317) 252-0352 *fax*
***Attorneys for Plaintiffs***