# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| SHERRIE BAKER, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 2:17-cv-429-JVB-JEM |
| ATLANTIC RICHFIELD COMPANY, et al., | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiffs Sherrie Baker, et al., filed a motion to remand this case back to the Lake County Superior Court. For the reasons below, this Court grants Plaintiffs' motion.

**A.     Overview of the Case**

Plaintiffs filed a complaint in state court against multiple defendants, claiming that, for decades, they "release[d] . . . dangerously large amounts of toxins into the environment" and contaminated the soil underneath Plaintiffs' homes by producing materials such as lead and zinc oxide. (DE 13 at 2–4.) Defendants Atlantic Richfield Company and BP West Coast Products LLC (collectively, the "Atlantic Defendants") timely removed the case on the basis of the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1). (DE 1.) Separately, Defendants E. I. du Pont de Nemours and Company and The Chemours Company (collectively, the "DuPont Defendants") filed their own notice of removal on the same basis.[1] (DE 6.)

---

[1] The remaining defendants did not join the Atlantic Defendants' notice of removal. However, under § 1442, any defendant can remove the case "with or without the consent of co-defendants." *Weese v. Union Carbide Corp.*, 2007 U.S. Dist. LEXIS 73970, at *13 (S.D. Ill. Oct. 3, 2007).

B.  **Standard of Review**

Plaintiffs have not brought any federal claims, and complete diversity does not exist. Nevertheless, § 1442 allows a defendant to remove the case when the complained-of conduct was performed "'under color' of federal office, regardless of whether the suit could originally have been brought in a federal court." *Willingham v. Morgan*, 395 U.S. 402, 406 (1969). The purpose of § 1442 is to "ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties." *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981). "This policy should not be frustrated by a narrow, grudging interpretation of § 1442." *Willingham*, 395 U.S. at 407.

To enjoy the benefit of § 1442, the removing defendant "must show that it was a (1) 'person,' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim."[2] *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180–81 (7th Cir. 2012) (quoting 28 U.S.C. § 1442(a)(1)). This burden, however, is not so great that the defendant must "win his case before he can have it removed." *Willingham*, 395 U.S. at 407. Instead, if a court must resolve the merits of the complaint to determine whether § 1442 jurisdiction exists, then removal is appropriate. *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999).

C.  **Analysis**

The Atlantic and DuPont Defendants operated facilities during the World War II period, where they produced materials the government needed to support the war effort. They rely on these operations to establish § 1442 jurisdiction. However, the bulk of their operations occurred

---

[2] Plaintiffs do not dispute that the Atlantic and DuPont Defendants are persons under § 1442. In any event, the Seventh Circuit considers corporations to be people for § 1442 purposes. *Ruppell*, 701 F.3d at 1181.

outside this time period. Thus, remand is appropriate.[3]

**(1)   The Atlantic Defendants' Government Contracts Are Too Few**

One who acts pursuant to a government contract acts under a federal officer. *Ruppel*, 701 F.3d at 1181 ("Ruppel's injury occurred while it 'acted under' a federal officer."). And when, in the absence of that contract, the defendant never would have performed that action, he has acted under color of federal authority. *Willingham*, 395 U.S. at 409 ("[The defendants'] relationship to [the plaintiff] derived solely from their official duties.").

Things get dicey, however, when the defendant regularly performs an activity, but only sometimes at the behest of the government. For instance, the Fifth Circuit in *Hansen v. Johns-Manville Prods. Corp.*, 734 F.2d 1036, 1045 (5th Cir. 1984), surmised that the government contractor defense would not apply where the defendant employer "performed work under government contract for only five of [the employee's] twenty-six years of employment." The Eastern District of Missouri used this logic to deny § 1442 jurisdiction: "the amount of PCBs manufactured by [the defendant] . . . at the direction of the government . . . relative to the total amount of PCBs allegedly persisting in the environment and food chain, is simply too small to satisfy" the under-color-of-federal-office element. *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016).[4]

On the flip side, where the defendant acts more often than not at the behest of the

---

[3] Plaintiffs and the DuPont Defendants filed separate requests for judicial notice. (DE 43, 63.) Plaintiffs request that this Court take judicial notice of filings in two related cases involving the same defendants and the same factual allegations. (DE 43.) The DuPont Defendants request that this Court take judicial notice of a consent decree into which the Atlantic and DuPont Defendants entered with the EPA. (DE 63.) No party has objected to either of these requests. This Court thus grants the requests and takes judicial notice of the requested documents.

[4] The logic behind this theory is that one is not acting under color of federal office when one simply does what one would have done anyway. To give an example, a firing range would not be able to remove a nuisance suit under § 1442 solely because, for a brief period of time, it happened to contract with a government agency to provide firearms training. While this example is not exactly on point, it illustrates the logic.

government, removal can be proper. *Cf. Ruppel*, 701 F.3d at 1181 ("Thus, the gravamen of Ruppel's complaint occurred while CBS acted under color of federal authority."); *Savoie v. Pa. Gen. Ins. Co.*, 2017 U.S. Dist. LEXIS 84804, at *28 (E.D. La. June 2, 2017) ("[T]he majority of the [asbestos-containing] ships built at Avondale were built pursuant to contracts with the federal government.").

Here, the Atlantic Defendants note that, "[i]n 1944, [they] held at least five defense contracts, under the terms of which it supplied $837,000 worth of zinc oxide to the U.S. Army." (DE 56 at 7.) However, while these contracts could conceivably constitute the Atlantic Defendants' entire output for 1944, this still leaves them with only one year in which they actually acted under a federal officer, given that the Atlantic Defendants produced toxic materials from 1938 to 1965. (DE 13 ¶ 68.) Elsewhere, the Atlantic Defendants cite a plethora of regulations spanning from 1941 to 1946. (DE 1 ¶¶ 16–18.) Yet, even granting that every ounce of production during that period was at the behest of the government—a wholly unwarranted assumption, as will be seen later—this leaves the Atlantic Defendants operating under government orders for roughly one fifth of the relevant time period. Whether this is enough is debatable. One year out of twenty-eight, however, does not suffice.

The Fifth Circuit faced a similar situation in which the government contracted with the defendants to manufacture an herbicide the defendants had always produced. *See Winters v. Diamond Shamrock Chem Co.*, 149 F.3d 387 (5th Cir. 1998). However, that case is distinguishable. There, the defendants would ordinarily dilute the herbicide to make it safe for commercial application, but the government wanted a more potent version, which they dubbed "Agent Orange." *Id*. at 399. Thus, the defendants needed to make a significantly more dangerous version of their product. Furthermore, the plaintiffs' lawsuit pertained only to the Agent Orange

4

variant of the herbicide. *Id*. Here, however, Plaintiffs are suing the Atlantic Defendants for the consequences of all of their production, not just the small portion that occurred during the War. Therefore, *Winters* does not save the Atlantic Defendants.

Lastly, the fact that § 1442 covers acts that merely "relat[e] to any act under color of [federal] office" does not change the situation. Congress added the "or relating to" language in 2011, and the Third Circuit in *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457 (3d Cir. 2015), examined the significance of this addition. There, the court found that the lawsuit before it "'relate[d] to' acts taken under color of federal office" because the defendants' "employment with [a federal officer] is the very basis of the" proceedings. *Id*. at 472. Here, on the other hand, Plaintiffs' lawsuit relates to actions the Atlantic and DuPont Defendants started before the War and continued after the War. The 2011 amendment thus does not change the analysis.

**(2)     The Atlantic Defendants Merely Complied with the Law**

Next, the Atlantic Defendants argue that they nevertheless acted under a federal officer even absent express contracts. The term "acting under" implies a relationship that involves "subjection, guidance, or control." *Watson v. Phillip Morris Cos.*, 551 U.S. 142, 151 (2007) (quoting Webster's New International Dictionary 2765 (2d ed. 1953)). However, "simply *complying* with the law" is not enough, "[a]nd that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id*. at 152–53. Here, the Atlantic Defendants' overreliance on regulations dooms its removal efforts.

(a)     *The Cited Regulations Did Not Impose a Duty to Produce*

In *Watson*, the Supreme Court held that "the usual regulator/regulated relationship" does not give rise to § 1442 jurisdiction. 551 U.S. at 157. There, the defendant, a cigarette company, was accused of intentionally designing its cigarettes to falsely register a lower level of tar and nicotine content than it actually had. *Id*. at 146. The defendant argued that it acted under the FTC, pointing to all the regulations the FTC requires cigarette companies to follow. *Id*. Specifically, the defendant argued that "the complaint attacked [its] use of the *Government's* method of testing cigarettes." *Id*. The Supreme Court rejected the defendant's argument, holding that "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *Id*. at 153.

The situation here is similar. During the War, the government found itself facing a shortage of vital materials. *See e.g.* 6 Fed. Reg. 2856 (June 12, 1941) ("[I]t is found that there exists a definite shortage of Zinc . . . [and] that such shortage will prevent [fulfillment of] future Naval and Army contracts."). In response, the government passed regulations "to Conserve the Supply and Direct the Distribution of" such materials. *Id*. These regulations required producers such as the Atlantic Defendants to set aside, for government purchase, certain quantities of what they produces. *Id*. at 2856–57. They also had to keep records of their inventories. *Id*. at 2857. Later, to stabilize prices, the government issued regulations setting maximum prices for these materials. *See e.g.* 7 Fed. Reg. 4585 (June 19, 1942). Violators could be prohibited from buying or selling the materials. *See e.g.* 8 Fed. Reg. 17475 (Dec. 30, 1943). The government also occasionally ordered wage increases. (DE 56-8 at 3.)

These regulations, however, are just that: regulations. Granted, the government encouraged the Atlantic Defendants to produce materials, but the government directed this request to the entire industry: "In an effort to ease the supply situation, an appeal was sent to all

lead producers . . . early in November, asking them to increase production." (DE 56-11 at 5.) This does not create a legal duty. Some of the Atlantic Defendants' exhibits reference quotas, but this refers to "that portion of mine output which would not be subsidized and would receive no more than the ceiling price," not a portion a producer was obligated to produce. (DE 56-10 at 14.) Lastly, the Atlantic Defendants provide an affidavit from Professor K. Austin Kerr stating that the government "could compel acceptance of war orders [and] requisition any property needed for the war effort." (DE 56-1 ¶ 9.) Yet, the Atlantic Defendants provide no evidence showing that they were compelled to accept any war orders or that the government seized or threatened to seize any of their property. As it stands, the Atlantic Defendants merely produced a product the government happened to want.

(b)  *The Atlantic Defendants Failed to Show Any Other Legal Duty to Produce*

Eventually, the government made good on its threat to seize plants. The Atlantic Defendants' principle example is the seizure of Montgomery Ward's Chicago plant in 1944. Near the beginning of the War, the government had outlawed labor strikes and created a board to resolve labor disputes. *United States v. Montgomery Ward & Co.*, 150 F.2d 369, 371 (7th Cir. 1945), *vacated as moot*, 326 U.S. 690.[5] On February 19, 1942, the board became aware of a labor dispute involving Montgomery Ward. *Id*. at 373. Eventually, the parties agreed to a labor contract. *Id*. When that contract expired, Montgomery Ward refused to renew, claiming the union had no legitimate authority. *Id*. The board ordered the contract temporarily extended while it determined the status of the union, but Montgomery Ward refused to comply. *Id*. The union

---

[5] Before the Supreme Court could hear this case, the government returned the plant to Montgomery Ward, thus mooting the case. Allen Pusey, *April 8, 1952: Truman Seizes Steel Mills*, A.B.A. J. (Apr. 1, 2017, 12:20 AM CDT), http://www.abajournal.com/magazine/article/truman_seizes_steel_mills.

then called a strike. *Id*. In response, government sent troops to seize the plant. (DE 56-9.)

The Atlantic Defendants, however, offer no evidence that they ever faced such a situation. For starters, the point of the seizures was to keep the plant running in the event of a strike; once the parties came to an agreement, the government returned the plant. *Montgomery Ward*, 150 F.2d at 371. The Atlantic Defendants never suggest they faced any labor strife. Second, to the extent the Atlantic Defendants argue that they operated solely because of some implied threat by the government to seize plants unless they produced, they have failed to meet their burden. *Cf. Kelly v. Monsanto Co.,* 2016 U.S. Dist. LEXIS 84294, at *33 (E.D. Mo. June 29, 2016) ("Furthermore, the exhibits do not show that the federal government compelled Old Monsanto to produce and sell PCBs.").

The Atlantic Defendants' reliance on the Selective Training and Service Act of 1940, Pub. L. No. 76-783, 54 Stat. 885, is insufficient. They describe this act as allowing the government to seize plants "if the owner refused to give a government order precedence or to fill a government order." (DE 56 at 18 n.4.) Again, however, the Atlantic Defendants have not shown that they would have produced any less had this act never been passed. They do cite *Issacson v. Dow Chemical Co.*, 517 F.3d 129, 138 (2d Cir. 2008), to argue that satisfying the "acting under" element does not require outright coercion. That court held, "We find no authority for the suggestion that a voluntary relationship somehow voids the application of the removal statute." 517 F.3d at 138. But "voluntary" referred to the defendants "voluntarily bid[ing] for the government contracts." *Id*. The defendants still had a legal duty to commit the act that gave rise to the lawsuit. *Id*. (referring to the defendants' action as "government-specified duties"). It is this legal duty the Atlantic Defendants have failed to show.

(c)   *Simply Helping the Government Does Not Suffice*

Next, the Atlantic Defendants argue that they acted under a federal officer because they helped the government by producing materials the government needed to purchase. (DE 56 at 15.) This language comes from *Watson*, which held that the "acting under" relationship "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152. *Issacson* has been interpreted as taking this concept to the extreme, suggesting that merely assisting the government will suffice.[6] 517 F.3d at 137. But again, even *Issacson* insisted on an actual legal duty before finding § 1442 jurisdiction. Thus, mere assistance, in the absence of a legal duty to render such aid, does not bestow § 1442 jurisdiction.

**(3)   The Atlantic Defendants Were Mere Suppliers**

Federal contractors who produce military equipment for the government are generally entitled to a defense for actions performed pursuant to their contracts. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). This defense has been extended to grant § 1442 jurisdiction to non-military contractors, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1090 (6th Cir. 2010), as well as subcontractors. *LaForge v. ECC Operating Servs.,* 2010 U.S. Dist. LEXIS 13583, at *5 (E.D. La. Feb. 5, 2010); *but see Morgan v. Great S. Dredging, Inc.*, 2012 U.S. Dist. LEXIS 141545, at *20 (E.D. La. Sept. 30, 2012) ("[B]ecause [the defendant] was . . . merely a subcontractor . . . it does not have a 'colorable' federal contractor defense.").

During the War, the government faced severe rubber shortages. (DE 56-40 at 6.) In response, it built plants to create synthetic rubber and leased them to various rubber companies. (DE 56-52 at 6.) The government ordered these companies to work together—principally by

---

[6] For a discussion on the potential breadth of *Issacson*, see *Creighton v. Fleetwood Enters.*, 2009 U.S. Dist. LEXIS 41731, at *24–27 (E.D. La. May 5, 2009).

9

sharing technology with each other and dropping any patent infringement suits between them—and also led the effort to develop the synthetic rubber compound. (DE 56-45 at 6.) The Atlantic Defendants claim that, because they sold materials to these rubber companies, they are subcontractors and thus are entitled to a federal contractor defense.[7]

However, the Atlantic Defendants have not shown that they were actually subcontractors. A subcontractor is "[o]ne who is awarded a portion of an existing contract by a contractor, esp. a general contractor." *Subcontractor*, Black's Law Dictionary (8th ed. 1999). Yet, one who merely furnishes goods to a contractor does not, by virtue of these sales, become a subcontractor. *American Chain Co. v. Interstate Iron & Steel Co.*, 291 F. 1006, 1008 (7th Cir. 1923) ("Therefore, seller, instead of being a subcontractor to perform a part within buyer's contract with the government, was an independent seller of the standard product which it was offering generally in the market.").

Here, the Atlantic Defendants merely sold some materials to the rubber companies, but did not design the materials themselves. Furthermore, the cases they cite in support of their defense are distinguishable, for in those cases, the subcontractors actually designed the components they sold to the contractors. *In re Air Disaster v. Lockheed Corp.*, 81 F.3d 570, 572 (5th Cir. 1996) (subcontractor designed the engines); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 69 (3d Cir. 1990) (subcontractor designed the ball bearings); *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 948 (4th Cir. 1989) (subcontractor developed the ejection seats).

*LaForge*, a case from the Eastern District of Louisiana, does appear to support the proposition that a mere supplier is a subcontractor. For starters, however, that subcontractor "supplied the [goods] pursuant to a contract." 2010 U.S. Dist. LEXIS 13583, at *4 n.2. Second,

---

[7] For the purposes of this motion, this Court will presume that these rubber companies, none of whom are defendants in this case, are federal contractors and would be entitled to § 1442 jurisdiction.

the opinion contains very little analysis. Third, that same district rejected the subcontractor defense outright only two years later. *Morgan*, 2012 U.S. Dist. LEXIS 141545, at *20. For these reasons, this Court does not find *LaForge* persuasive and thus declines to follow it.

**(4)  The DuPont Defendants' Supplemental Arguments Similarly Fail**

The above analysis applies with equal force to the DuPont Defendants. Nevertheless, the DuPont Defendants offer additional arguments: (1) they produced some materials—Freon-12 and its byproducts (collectively, "Freon")—solely at the behest of the government; and (2) the government allocated some lead to them. Ultimately, neither argument is persuasive.

(a)  *Plaintiffs Are Not Suing Over Freon Production*

The DuPont Defendants actually have a strong case for § 1442 jurisdiction on the basis of their Freon production—so strong, in fact, that Plaintiffs have waived any claims related to Freon production at the outset: "This action does not pertain to [the] DuPont [Defendants'] manufacture and production of Freon-12 and the byproduct of hydrochloric acid." (DE 13 ¶ 67.) The DuPont Defendants label this an exercise in jurisdictional chicanery, but many courts have accepted similar waivers and remanded accordingly.

As "master of [their] complaint," Plaintiffs are free to bring any claim they wish and, conversely, are free not to bring any claim they do not wish. *Cf. Ray v. Laidlaw Med. Trans., Inc.*, 2006 U.S. Dist. LEXIS 1198, at *7 (N.D. Ind. Jan. 13, 2006) ("Even though Ray could potentially have sued Laidlaw under the FLSA, as master of his complaint, Ray is entitled to file a state law cause of action while foregoing any right to relief under federal law."). In the context of § 1442 jurisdiction, a plaintiff can sue a defendant for its activities but waive any claims

11

related to portions of those activities performed at the behest of the government. *See e.g. Kelleher v. A.W. Chesterton Co.*, 2015 U.S. Dist. LEXIS 159783, at *8–9 (S.D. Ill. Nov. 23, 2015) (granting remand where the plaintiff sued for asbestos exposure but waived all claims related to exposure during the plaintiff's stint in the military).

On the other hand, not all waivers are effective. For instance, where the plaintiff waives a claim but is clearly seeking relief for that claim nonetheless, removal remains appropriate. *Cf. Oberstar v. CBS Corp.*, 2008 U.S. Dist. LEXIS 14023, at *7–8 (C.D. Cal. Feb. 11, 2008) (waiver ineffective where the plaintiff waived claims for exposure "committed at the direction of [a federal] officer" but nonetheless sought relief for exposure aboard Navy vessels). Likewise, courts are inclined to deny remand where the plaintiff simply waives all federal claims in a super-generic sense. *Cf. Marley v. Elliot Turbomachinery Co.*, 545 F. Supp. 1266, 1274 (S.D. Fla. 2008) (rejecting as circular a waiver stating that "[e]very claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed").

Here, Plaintiffs specifically waive claims related to Freon production, so they do not raise the problem the *Marley* court faced. Instead, the DuPont Defendants attempt to paint this waiver as ambiguous. The strongest example of ambiguity comes near the beginning of Plaintiffs' complaint: "the residents of the Site . . . have been exposed to hazardous materials including *without limitation* lead and arsenic" (emphasis added). (DE 13 ¶ 7.) Yet, "I was exposed to *x*" and "I am suing over exposure to *x*" are two different concepts. Elsewhere, the DuPont Defendants note that Plaintiffs' complaint contains non-specific phrases such as "hazardous materials" and "toxic substances." (*See* DE 13 ¶¶ 7, 10.) However, Plaintiffs are simply referring to the produced materials generically, while later clarifying that they are not suing over Freon production. This Court will not force them to clutter their complaint by repeatedly (and

unnecessarily) appending "except for Freon-12 and the byproduct of hydrochloric acid" to every mention of the DuPont Defendants' production. The waiver does the job just fine.[8]

(b)  *The DuPont Defendants' Government Contracts Are Too Few*

Aside from Freon production, the DuPont Defendants note that the government allocated four batches of lead to them over two years. (DE 6 ¶ 22.) Like with the Atlantic Defendants, this Court will presume, for the purposes of this motion, that every ounce of production by the DuPont Defendants during the six-year-long regulation blitz was at the behest of the government. Yet, the DuPont Defendants fare even worse than the Atlantic Defendants. Plaintiffs charge the DuPont Defendants with tortiously producing materials from 1910 to 1949. This means they took orders from the government for, at most, only 15% of the relevant time period. Moreover, crediting them with only the two years in which they actually received shipments—still a generous assumption—reduces this down to 5%.

The DuPont Defendants seem to argue that one who continuously performs an activity is entitled to § 1442 jurisdiction if any instance of that activity was at the behest of the government. This Court is not persuaded. Accepting this logic would allow, for instance, any similar manufacturer to ensure removal of any claim related to its pollution by entering into a single, insignificant transaction with someone who happens to be a federal officer. True, courts must construe § 1442 broadly, "[b]ut broad language is not limitless." *Watson*, 551 U.S. at 147. After all, if a de minimis amount of transactions were enough to establish § 1442 jurisdiction, the Supreme Court in *Willingham* would not have felt the need to explicitly note that the parties' "relationship . . . derived *solely* from [the defendants'] official duties." 395 U.S. at 409. This

---

[8] Of course, if Plaintiffs violate their own waiver and start attacking the DuPont Defendants over their production of Freon, then a subsequent notice of removal might be appropriate.

Court agrees with Plaintiffs: the Atlantic and DuPont Defendants were, by and large, "private parties who were free to do as they pleased." (DE 42 at 4.)

**D.     Conclusion**

This Court grants Plaintiffs' and the DuPont Defendants' requests for judicial notice. (DE 43, 63.) As for the motion to remand, the Atlantic and DuPont Defendants have failed to establish § 1442 jurisdiction. Accordingly, Plaintiffs' motion to remand is GRANTED.

IT IS HEREBY ORDERED that the case captioned Sherrie Baker, et al., v. Atlantic Richfield Company, et al., under the United States District Court, Northern District of Indiana, Hammond Division with Cause No. 2:17-cv-429-JVB-JEM, is now remanded to the Lake County Superior Court.

SO ORDERED on September 30, 2019.

 S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE